UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

ADRIAN A. SAMPSON,

                            Plaintiff,

        v.

IMAGE 2000, INC.,

                            Defendants.

Case No. 2:13-cv-01321-MMD-NJK

ORDER

## I.     SUMMARY

Before the Court is Defendant Image 2000, Inc.'s Motion for Summary Judgment ("Motion"). (Dkt. no. 20.) For the reasons discussed herein, the Motion is granted in part and denied in part.

## II.    BACKGROUND

This is an employment dispute. Defendant sells office equipment and provides supporting technology, document management and consulting services to its clients. Defendant requires its sales representatives to meet established monthly quotas set based on their level of compensation:  level 1 requires a monthly sales quota of $25,000 and provides for an annual salary of $24,000; level 2 involves an increase of the monthly sales quota to $35,000 with an annual salary of $36,000; and level 3 involves an increase of the monthly sales quota to $50,000 with a commensurate increase in the annual salary to $48,000. New sales representatives are given a reduced quota amount for the first few months to give them a chance to "ramp-up." After the "ramp-up" period, sales representatives are expected to meet the monthly quota for their respective level.

Plaintiff was employed with Defendant in its Las Vegas location in the position of sales representative from February 1, 2011, until January 4, 2012, when his employment was terminated.[1]  Plaintiff elected to start at level 2 with the understanding that he would move up to level 3 after he built up his business to where he was producing $50,000 or more in sales. (Dkt. no. 20-4 at 21.) Plaintiff met this monthly quota for only two months, June and July 2011; for those two months his sales were $44,294 and $45,190 respectively. (Dkt. no. 20 at 7.) After July, Plaintiff's sales number gradually decreased and then dropped significantly in November and December 2011. (*Id.*)

Plaintiff complained about discrimination to the General Manager of Defendant's Las Vegas office, John Eaton, and Defendant's General Manager, Jeffrey Rudisel in April or May. Plaintiff again complained about discrimination to Mr. Eaton shortly thereafter and to Mr. Rudisel in November 2011. On December 6, 2011, Plaintiff sent an email to Defendant's Human Resources Director, Heather Bergo, to inform her that he believed he had been subjected to race discrimination, retaliation and other unfair treatment. (Dkt. no. 20-17.) In response to Defendant's complaint to Ms. Bergo, Defendant retained an external investigator to investigate Plaintiff's complaint. The external investigator presented a report dated January 2, 2012, finding that no discrimination or retaliation had occurred. (Dkt. no. 20-18.) On January 4, 2012, Defendant terminated Plaintiff's employment. Plaintiff testified that this occurred shortly after he informed Mr. Eaton that he had initiated a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Dkt. no. 20-5 at 15.)

Defendant contends it terminated Plaintiff's employment for non-performance. Plaintiff disputes this contention.

///

---

[1]The named Defendant, Image 2000, Inc., is based in California. Its subsidiary, Image 2000 Nevada, Inc., is based in Las Vegas and, according to Defendant, Image 2000 Nevada, Inc. was Plaintiff's actual employer. There appears to be a dispute as to whether Image 2000, Inc. is considered a joint employer, but this dispute is not relevant to the issues presented in the Motion.

### III.     LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). Courts must also liberally construe documents filed by pro se litigants. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific

facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (citation and internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

The Complaint asserts four claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII), and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Defendant moves for summary judgment on all claims. In response, Plaintiff consents to entry of summary judgment on his two claims for discrimination based on race (counts I and III). (Dkt. no. 21, n. 1.) Accordingly, summary judgment will be granted as to these two claims. The Court will address Plaintiff's retaliation claims (counts II and IV).

The parties agree that the burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies to Plaintiff's retaliation claims. Under this framework, the plaintiff bears the burden of establishing a prima facie case of retaliation. *Davis v. Team Elec.Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008.) If the plaintiff meets this burden, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged action. *Id.* If the defendant satisfies this burden, the plaintiff must show that the proffered reason is a pretext for retaliation. *Id.*

### A.   Prima Facie Case

A prima facie case of retaliation requires a showing that:  (1) the plaintiff engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between these two events. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, ///

4

1064 (9th Cir. 2002). Defendant argues that Plaintiff cannot establish the first and third

elements.[2] The Court disagrees.

The first element is satisfied if the plaintiff made an internal complaint of discrimination based on a protected status. *Id.* at 1064 (finding that internal complaint about sexually harassing conduct qualified as a protected activity). Plaintiff alleges two types of protected activities: (1) he complained internally about discriminatory treatment; and (2) he filed a charge of discrimination with the EEOC. The Court finds that the first type satisfies the protected activity element and will not address the second type of protected activity.

Defendant contends that while Plaintiff made numerous complaints of discrimination, he did not put Defendant on notice that he was claiming discrimination *because of his race* until December 6, 2011, after he had been counseled and knew "[h]is days at Image 2000 were numbered." (Dkt. no. 20 at 26-27, 29.) According to Defendant, Plaintiff "used the word 'discrimination' to refer to any type of treatment that he believed was unfair" but Plaintiff "never mentioned race discrimination" until his December 6, 2011, email to Defendant's Human Resources Director. (Dkt. no. 20 at 27.) Even accepting Defendant's argument, Plaintiff's December 6, 2011, email satisfied the first element in that he complained about discrimination based on his race. *See Villiarimo*, 281 F.3d at 1064.

As for the pre-December 6, 2011, complaints, Plaintiff counters that in the context of his employment where he was the only African American employee and he complained about unequal treatment in comparison to his two male Caucasian colleagues, his complaints that he believed he was subjected to discrimination sufficiently put Defendant on notice of race discrimination. In particular, Plaintiff testified that in a meeting with Mr. Eaton and Mr. Rudisel in April or May 2011, he complained of

///

_____

[2]There is no question that termination is an adverse employment action. *See Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 970 (9th Cir. 2001) (as amended) ("And, of course, termination of employment is an adverse employment action . . .").

discrimination by stating that: "I felt that you are discriminating against me and treating me with double standards because you're denying me the same opportunity that you've given Mike [Miller] and Mr. Peterson." (Dkt. no. 21-13 at 57.) He later complained to Mr. Eaton that he thought he was not being paid the "same fair wages" as Mr. Miller and Mr. Peterson. (*Id.*) Mr. Miller and Mr. Peterson were two other sales representatives working at Defendant's Las Vegas location; both are Caucasian. Plaintiff admitted that he did not tell Mr. Eaton that he thought the unfair treatment was because of his race. (*Id.*) However, Plaintiff, an African American, was complaining of unfair treatment in terms of compensation and opportunities given his Caucasian colleagues. Viewing this evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, a reasonable jury may find that Plaintiff's discrimination complaints involved *race* given the obvious racial disparity between Plaintiff and the other sales representatives.

Moreover, Plaintiff has also offered evidence to establish that by mid-November 2011, Defendant knew that Plaintiff's complaints were made because of perceived race discrimination. Plaintiff testified that on November 15 or 16, 2011, he told Mr. Rudisel that he believed he was subjected to discrimination because of some actions that had been taken, such as accounts and company issued cell phone being taken away and repossession of a copier that he had sold. (Dkt. no. 21-13 at 59). In that conversation, Plaintiff did not expressly reference race discrimination. (*Id.*) However, Plaintiff points to a November 29, 2011, email from Mr. Rudisel as evidence that Mr. Rudisel understood that Plaintiff was complaining of race discrimination. In that email, Mr. Rudisel wrote that he "never want to hear [Plaintiff] say anything again regarding [his] ethnicity." (Dkt. no. 21-17 at 4.) A reasonable jury may infer from this comment that Mr. Ruidsel understood Plaintiff's complaint was about perceived unfair treatment because of race.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has established that he engaged in protected activity by making internal complaints about race discrimination to establish the first element of his prima facie case. The Court will next address Defendant's argument as to the third element of causal connection.

At the prima facie stage, the causal link element is construed broadly. *Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007). In some cases, causation may be inferred "from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo.*, 281 F.3d at 1065 (citations omitted); *see also Phillips v. PacificCorp,* 304 F.App'x 527, 530 (9th Cir. 2008) ("As [the plaintiff] had received good performance reviews previously, but received negative reviews and was placed on a performance improvement plan shortly after her discrimination complaint, the proximity alone is enough to establish a causal link.");[3] *Bell v. Clackamas Cnty.,* 341 F.3d 858, 865 (9th Cir. 2003) (finding strong circumstantial evidence of retaliation where low performance reviews immediately followed plaintiff's complaints and employer contemporaneously expressed displeasure with complaints). For example, the Ninth Circuit has found that causation was established where an employer was aware that complaints were made and the adverse employment action occurred within three months after the first administrative complaint was filed. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). In fact, the Ninth Circuit has found that "evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) (citation omitted).

Here, the causal connection may be inferred from the timing of Plaintiff's complaints and his termination. Plaintiff complained about discrimination in April or May, November and December 6, 2011. Defendant contends it started the process for terminating Plaintiff on December 20, 2011, and informed Plaintiff of his termination on January 4, 2012. Nevertheless, the temporal proximity between Plaintiff's complaints and his employment termination alone is enough for a reasonable jury to find a causal link between Plaintiff's complaints and his employment termination. Defendant initiated

*///*

---

[3]Defendant relies on *Phillips* to suggest that closeness in time between the protected activity and adverse employment action is not enough to foreclose a finding of summary judgment in an employer's favor. (Dkt. no. 22 at 5-6.)

termination proceedings within 2 weeks of Plaintiff's December 6, 2011, email complaint to Ms. Bergo; and Plaintiff's employment was terminated 2 days after Defendant's outside consultant completed investigation into Plaintiff's complaint.

**B.    Pretext**

Pretext may be shown by "directly persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1066 (9th Cir. 2003) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). Where the plaintiff relies on circumstantial evidence that the defendant's motives were different than its proffered motives, evidence of pretext must be "specific" and "substantial" to survive summary judgment. *Id.* (citation omitted).

Plaintiff argues that comments by Mr. Rudisel and Mr. Eaton amount to direct evidence of pretext. Plaintiff refers to: (1) Mr. Rudisel's statement in his November 29, 2011, email that he did not want to hear Plaintiff say anything regarding his "ethnicity;" and (2) Mr. Eaton's statement to the external investigator that he did not know "how he can return and smooth things over after allegations like this." (Dkt. no. 21 at 28.) The Court agrees with Defendant that these comments are not direct evidence of retaliation. Accordingly, Plaintiff must offer "specific" and "substantial" evidence to create a triable issue of fact as to pretext.

Plaintiff challenges Defendant's proffered reason for terminating Plaintiff as pretext based on a number of grounds. The Court finds Plaintiff has offered specific and substantial evidence that Defendant's articulated reason for terminating Plaintiff's employment is pretextual.

Plaintiff points to the discrepancies in the reasons given for his termination as evidence of pretext. Defendant claims Plaintiff's employment was terminated because of

///

///

///

8

Plaintiff's monthly and quarterly sales for December 2011.[4] (Dkt. no. 20 at 10-11.) Plaintiff points out that Mr. Eaton testified that his employment was terminated because he failed to meet his quota for his entire tenure. (Dkt. no. 21 at 18.) Defendant dismisses this discrepancy, arguing that the distinction is meaningless in Plaintiff's case because he failed to meet his quota for December 2011 and all but two months of his employment. The Court finds that these two reasons are not inconsistent because Plaintiff did not meet performance expectations under either scenario.

Even accepting that the reasons for the termination were consistent, however, Plaintiff has offered evidence that may lead a reasonable jury to find that Defendant's policy is flexible in terms of *when* termination would be initiated. It is undisputed that Defendant expects its sales representatives to meet their monthly quota commensurate with their compensation level, and sales representatives may be terminated for failure to meet their quota. However, what is disputed is when termination would be implemented — after a sales representative fails to meet monthly sales quota for a month? A quarter? Or more? There is evidence before the Court that creates a factual dispute as to whether the timing of Plaintiff's termination was because of his complaints.

Defendant's proffered reasons for Plaintiff's termination demonstrate the flexibility in Defendant's practice. Defendant offers the testimony of Ms. Bergo and Mr. Rudisel to support its assertion that sale representatives who fail to meet established monthly sales quota may be moved to a lower level or terminated, and those who fail to meet the requirements of the lower level may be terminated. (Dkt. no. 20 at 5.) However, the following exchange shows that Ms. Bergo was not familiar with Defendant's usual termination practice.

> Question:  Was there any usual practices that Image 2000 followed as to whether an employee would be moved downed to the next comp level or terminated?
>
> Answer:  Yes.

---

[4]In a letter dated January 12, 2012, Defendant's HR Director gave as the reason for termination Plaintiff's failure to meet his monthly quota for the last quarter of 2011. (Dkt. no. 21-12.)

1    Question:  What was that practice?

2    Answer:  I don't know.

3  (Dkt. no. 20-6 at 4 (depo of Bergo at 23:9-14).)  Mr. Rudisel testified regarding

4  Defendant's practice as to when to terminate a sales representative for failure to meet

5  monthly sales quota:

6    Question:   And why would Image 2000 place somebody on a lower
     compensation level rather than terminate that representative?
7
     Answer:  It depends on the individual. If they're cooperative, trying their
8    best to get the job done, following company policy, we try to work with
     those individuals. The individuals that do not, we tend not to do that.
9
     Question:  In deciding to terminate Mr. Samson, why was he terminated
10   rather than putting him at the lower compensation level?

11   Answer:  Proceeded on numerous occasions not to follow the company's
     policies or guidelines.
12

13  (Dkt. no. 20-7 at 4 (depo of Rudisel at 12:2-14).)  Viewed in the light most favorable to

14  Plaintiff, Mr. Rudisel's testimony shows that Defendant's policy provides for some

15  flexibility as to when termination would be initiated.

16    Moreover, Plaintiff points to other evidence to show that Defendant's policy is not

17  as rigid as Defendant makes it out to be. Plaintiff argues that:  (1) he was the only sales

18  representative in the Las Vegas office to have made any sales in December 2011; and

19  (2) nine other sales representatives did not meet level 1's sales quota of $24,000 during

20  the fourth quarter of 2011.[5] In response to the first point, Defendant explains that Mr.

21  Peterson had been terminated for lack of productivity and Mr. Miller had exceptional

22  sales numbers for October 2011. Mr. Miller's sales total for October 2011 was

23  $326.881, but he did not have any sales in November and December. (Dkt. no. 22 at

24  15.) However, this only shows there is some flexibility for a sales representative not to

25    [5]Plaintiff was ranked no. 14 on the list of year to date sales through November
26  2011. (Dkt. no. 21-10.) Defendant argues that sales representatives from other locations
    are not similarly situated. However, Mr. Eaton appeared to have considered them to be
27  similarly situated. He informed the external investigator that of "roughly 25 Sales
    Representatives in the entire Company," Plaintiff was ranked no. 14. (Dkt. no. 21-11 at
28  38.)

meet their monthly quota. While Mr. Peterson was terminated for the same articulated reason as Plaintiff's termination, the evidence before the Court does not show the duration of time that he failed to meet his monthly sales quota. For this reason, the Court cannot determine whether Mr. Peterson was Plaintiff's "only true comparator" as Defendant claims. (*Id.* at 16.)

Defendant's response to the second point further demonstrates that its policy is more forgiving than Defendant represents. Indeed, sales representatives are not terminated for failing to meet their monthly quota after a month or even a quarter. For example, Defendant's General Manager claims that Joe Meija, no. 22 on the list, resigned on August 31, 2012, but he was going to be terminated for non-performance, while Eric Sheeler, no. 20 on the list, was terminated for non-performance on February 29, 2012. (Dkt. no. 22-1.) The fact that Mr. Sheeler, who was ranked higher, was terminated in February 2012 while Mr. Meija was not terminated at the same time may show that failure to perform does not result in immediate termination. Defendant's explanation does not explain why Plaintiff, who ranked higher in terms of year to date sales than both Mr. Sheeler and Mr. Meija, was selected for termination earlier — on January 2, 2012, while Mr. Sheeler was given another month until February 2012 and Mr. Meija was permitted to resign in August 2012. This evidence may lead a reasonable trier of fact to find that Defendant's policy is flexible, making the timing of Plaintiff's termination suspect.

"Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cnty.,* 341 F.3d 858, 865 (9th Cir. 2003) (finding sufficient evidence to support retaliation claim where low performance reviews immediately followed plaintiff's complaints). The Court finds that his is one such case. The timing of Plaintiff's termination, particularly where Plaintiff has offered evidence to show that Defendant's policy is flexible, may lead a reasonable jury to find circumstantial evidence of retaliation. Plaintiff has also pointed to statements made by Defendant's employees

as evidence of pretext. As Mr. Rudisel testified, Defendant "will try to work with those individuals" who cooperate. (Dkt. no. 20-7 at 4.) Mr. Eaton told the external investigator hired to look into Plaintiff's discrimination complaint that he "does not know how he can return and smooth things over after allegations like this." (Dkt. no. 21-11 at 28.) These statements offer additional circumstantial evidence that may cause a reasonable jury to find that Defendant decided not to work with Plaintiff because of his complaints of race discrimination. The Court therefore finds that Plaintiff has offered specific and substantial evidence of pretext to avoid summary judgment.

**V.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Defendant's Motion for Summary Judgment (dkt. no. 20) is granted in part and denied in part. The Motion is granted with respect to Plaintiff's discrimination claims (counts I and III) and denied with respect to Plaintiff's retaliation claims (counts II and IV).

DATED THIS 25th day of March  2015.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE